IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 9:15-CV-81002 (Marra/Matthewman)

KEVIN BUJA,

        Plaintiff,

v.

NOVATION CAPITAL, LLC, *et al.*,

        Defendant.

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     Legal standard ................................................................................................. 1

II.    NC Legacy is entitled to summary judgment on all claims because it did not engage in any of the activities alleged in this case ............................................. 2

III.   Defendants are entitled to summary judgment on Buja's ATDS claim............................ 2

    A.    Use of a click-to-dial system does not constitute use of an ATDS....................... 3

    B.    The past use of the Refractive Dialer system version does not change this analysis............................................................................... 8

    C.    Even if the Ventures' system had the capacity to randomly or sequentially dial numbers (which it never did), mere capacity is not enough ........................... 9

IV.   Defendants are entitled to summary judgment on Buja's DNC claim............................ 10

    A.    Defendants cannot be liable under the DNC provision of the TCPA because they are not "telemarketers" or "sellers"................................. 11

    B.    Ventures and Funding have adequate DNC policies and procedures in place, further justifying summary judgment in favor of Defendants.................. 14

    C.    The Biggerstaff Report, concluding that Defendants do not have adequate DNC procedures in place, is deeply flawed and should be disregarded.............. 18

V.    Defendants are entitled to summary judgment on Count III because Buja has no viable TCPA claim............................................................................. 20

VI.   Conclusion ..................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACA Int'l v. FCC*,
    Case No. 15-1211 (D.C. Cir.) ...................................................................................10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).....................................................................................................2

*Chyba v. Bayview Loan Servicing, LLC*,
    2016 U.S. Dist. LEXIS 133849 (S.D. Cal. Sept. 27, 2016).................................7, 10

*Dolemba v. Ill. Farmers Ins. Co.*,
    2015 U.S. Dist. LEXIS 104314 (N.D. Ill. Aug. 10, 2015)........................................12

*Estrella v. LTD Fin. Servs., LP*,
    2015 U.S. Dist. LEXIS 148249 (M.D. Fla. Nov. 2, 2015) .........................................4

*Ferrer v. Bayview Loan Servicing, LLC*,
    2018 U.S. Dist. LEXIS 12600 (S.D. Fla. Jan. 26, 2018) ...........................................3

*Frisch v. AllianceOne Receivables Mgmt.*,
    2017 U.S. Dist. LEXIS 260 (E.D. Wis. Jan. 3, 2017)................................................3

*Gaza v. LTD Fin. Servs., L.P.*,
    2015 U.S. Dist. LEXIS 111751 (M.D. Fla. Aug. 24, 2015) ......................................4

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..................................................................................................13

*Hinson v. Warren*,
    2018 U.S. Dist. LEXIS 19439 (S.D. Fla. Feb. 5, 2018) ............................................1

*Horvath v. Chicago*,
    510 F.2d 594 (7th Cir. 1975) ...................................................................................13

*Jenkins v. mGage, LLC*,
    2016 U.S. Dist. LEXIS 106769 (N.D. Ga. Aug. 12, 2016) .......................................4

*Mainstream Mktg. Servs. v. FTC*,
    358 F.3d 1228 (10th Cir. 2004) ...............................................................................12

*Makaron v. GE Sec. Mfg.*,
    2015 U.S. Dist. LEXIS 75240 (C.D. Cal. May 18, 2015) ........................................13

*Messina v. Green Tree Servicing, LLC*,
   2016 U.S. Dist. LEXIS 186216 (N.D. Ill. Sept. 28, 2016) ......................................3

*Pozo v. Stellar Recovery Collection Agency, Inc.*,
   2016 U.S. Dist. LEXIS 146432 (M.D. Fla. Sept. 2, 2016) .................................4, 10

*Smith v. Stellar Recovery, Inc.*,
   2017 U.S. Dist. LEXIS 35658 (E.D. Mich. Feb. 7, 2017) .....................................10

*United States ex rel. Fitzgerald v. Jordan*,
   747 F.2d 1120 (7th Cir. 1984) ............................................................................13

*Vira v. Crowley Liner Servs.*,
   2018 U.S. App. LEXIS 2745 (11th Cir. Feb. 2, 2018) ...........................................1

*Walker v. Darby*,
   911 F.2d 1573 (11th Cir. 1990) ............................................................................2

**Statutes**

47 C.F.R. § 64.1200 .................................................................................... *passim*

47 U.S.C. § 227 ........................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 ....................................................................................... 1, 2

**Other Authorities**

https://www.consumer.ftc.gov/articles/0108-national-do-not-call-registry ...................................17

Pursuant to Fed. R. Civ. P. 56, defendants NC Legacy, LLC (f/k/a Novation Capital, LLC) ("NC Legacy"), Novation Funding, LLC ("Funding"), and Novation Ventures, LLC ("Ventures") (collectively, "Defendants") move for summary judgment on all claims asserted by plaintiff Kevin Buja.  More than two and a half years after this litigation was filed, Buja has failed to identify *any* evidence that would allow a reasonable jury to conclude that Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), in making calls to him.  Buja maintains that Defendants used an Automatic Telephone Dialing System ("ATDS") to make unsolicited calls to him in violation of the TCPA and that Defendants continued to call him after he requested not to be called, in violation of the do-not-call ("DNC") provisions of the TCPA.  *See generally* Second Amended Complaint ("SAC") [DE 102].  Buja also purports to represent three putative classes of similarly situated individuals.  (SAC, at ¶ 43).

But there is no genuine issue of material fact that (1) NC Legacy had no involvement in the calls at issue in this case, (2) the equipment used to make the calls at issue was not an ATDS, (3) the DNC provisions of the TCPA do not apply to Ventures and Funding because they are not "telemarketers" or "sellers," and (4) regardless, Ventures has adequate DNC policies and procedures in place.  Accordingly, the Court should enter summary judgment for Defendants.

## I.      Legal standard

"A grant of summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Vira v. Crowley Liner Servs.*, 2018 U.S. App. LEXIS 2745, *5-*6 (11th Cir. Feb. 2, 2018) (citing Fed. R. Civ. P. 56(a)).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Hinson v. Warren*, 2018

U.S. Dist. LEXIS 19439, *5 (S.D. Fla. Feb. 5, 2018) (Marra, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Id.*  "Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  *Id.*  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## II.    NC Legacy is entitled to summary judgment on all claims because it did not engage in any of the activities alleged in this case.

NC Legacy is entitled to summary judgment on all claims asserted by Buja because NC Legacy had no involvement in the calls at issue.  The evidence shows that NC Legacy is a non-operational Delaware limited liability company, known as Novation Capital, LLC, until August 24, 2012.  (Statement of Material Facts ("SOF"), ¶ 1).  NC Legacy transferred assets to Funding as part of corporate restructuring in 2012.  (SOF, ¶ 2).  NC Legacy does not engage in any calling, and did not place any calls to Buja.  (SOF, ¶ 8).  Buja has presented no evidence to the contrary and, in fact, Buja acknowledged in his deposition that he has no such evidence.   (SOF, ¶ 9) ("Q.  What evidence do you have of Novation Capital, LLC, having used an automatic telephone dialing system to place calls to your 2922 cell phone number? A.  What evidence do I have? Concrete, none.").  The calls at issue in this case were made by Ventures on behalf of Funding.  (SOF, ¶ 4).  There is simply no factual basis for Buja to assert a claim against NC Legacy, which thus is entitled to summary judgment in its favor.

## III.    Defendants are entitled to summary judgment on Buja's ATDS claim.

Buja's claim in Count I of the SAC is that Defendants made calls to him using an ATDS

without prior express consent, in violation of the TCPA.  (SAC, ¶¶ 58-60).  The equipment at issue is owned by Ventures and used by funding executives employed by Ventures to make calls on behalf of Funding.  (SOF, ¶¶ 3, 16).  But the system at issue is not an ATDS.  Accordingly, Ventures and Funding are entitled to summary judgment in their favor on Count I.

A.      **Use of a click-to-dial system does not constitute use of an ATDS.**

The system used to make calls on behalf of Funding is a ShoreTel telephone system paired with a Salesforce customer relationship management ("CRM") database.  (SOF, ¶ 10).  At all relevant times, a funding executive has had to select an individual to call from Salesforce, manually hover a cursor over the number, and manually click the number, causing it to be called via the ShoreTel system.  (SOF, ¶ 11).  To place another call, the employee must repeat this process — numbers are never predictively dialed by the system, never placed into a queue to be called, never called automatically in any sequence, and never called automatically at random. (SOF, ¶ 12).  That system has been in place since 2008 and thus is the system used for all of the calls made to Buja's cellular telephone between March 2014 and July 2015.  (SOF, ¶ 13).

Courts have routinely held that systems requiring agents to "point and click" to initiate calls are not ATDSs because human intervention is required.  *See, e.g., Ferrer v. Bayview Loan Servicing, LLC,* 2018 U.S. Dist. LEXIS 12600, *17 (S.D. Fla. Jan. 26, 2018) (granting summary judgment where "the primary function of the [defendant's platform] is to permit a user to dial phone calls using a computer keyboard and mouse, and that the calls must be manually dialed"); *Frisch v. AllianceOne Receivables Mgmt.*, 2017 U.S. Dist. LEXIS 260, *10 (E.D. Wis. Jan. 3, 2017) (granting summary judgment and finding that a click-to-dial system was part of a "manual process"); *Messina v. Green Tree Servicing, LLC*, 2016 U.S. Dist. LEXIS 186216, *16-*18 (N.D. Ill. Sept. 28, 2016) (finding that a system using a click-to-dial mechanism was not an

ATDS); *Pozo v. Stellar Recovery Collection Agency, Inc.*, 2016 U.S. Dist. LEXIS 146432 (M.D. Fla. Sept. 2, 2016) (same); *Jenkins v. mGage, LLC*, 2016 U.S. Dist. LEXIS 106769, *1, *7 (N.D. Ga. Aug. 12, 2016) (granting summary judgment and concluding that the platform at issue was not an ATDS when the agent had to log into a system, decide who to text, compose the message, and personally send the message); *Gaza v. LTD Fin. Servs., L.P.*, 2015 U.S. Dist. LEXIS 111751, *1, *4 (M.D. Fla. Aug. 24, 2015) (granting summary judgment when "the agent pulled up the subject account from a database and then used his mouse to manually click on the phone number associated with the account to launch the call"); *Estrella v. LTD Fin. Servs., LP*, 2015 U.S. Dist. LEXIS 148249, *3 (M.D. Fla. Nov. 2, 2015) (granting summary judgment when "the evidence demonstrates, at most, that the calls were placed manually with the use of human intervention through a 'point and click function'").

Defendants have produced recordings of every call with Buja, each of which demonstrates human intervention — a fact that Buja acknowledged in his deposition. (SOF, ¶ 14). Defendants have produced the manual and technical specifications for the relevant system, which show no ATDS capacity. (SOF, ¶ 15). Defendants' Rule 30(b)(6) witnesses have testified in depositions about the extent to which the systems require human intervention. (SOF, ¶ 17). And Defendants have even produced screenshots and a video showing the interface and the necessity for the caller to click on each individual number to initiate a call. (SOF, ¶ 18).

Defendants also have produced an unrebutted expert report from third-party telephony expert Kenneth Sponsler opining that the system does not have the components of an ATDS, nor does it have the capacity to perform such functions. (SOF, ¶ 19). Sponsler found that the system is a ShoreTel 14.2 Telephone System that interfaces with Salesforce for its CRM functionality. (SOF, ¶ 20). Neither of those systems possesses any components of an ATDS or any advanced

dialer features whatsoever.  (SOF, ¶ 21).  Sponsler opined that no capacity exists to enable the use of any advanced dialing features, including power, progressive, or predictive modes.  (SOF, ¶ 22).  The combination of the Salesforce CRM database and the ShoreTel telephone system requires, and has required at all times relevant to this case, each and every call to be placed manually by each individual agent.  (SOF, ¶ 23).  The following manual human intervention steps are required (and have always been required) by each funding executive to place an outbound telephone call.  Once the agent is logged into Salesforce, the funding executive:

(a)   Reviews potential seller accounts available for calls;

(b)   Selects "control + mouse click" to open a record within a browser;

(c)   May select multiple records to open in a browser — but still must click on each record to make each call;

(d)   Reviews the record and decides whether or not to place an outbound call;

(e)   Decides which among the available telephone numbers in the record to dial;

(f)   Hovers the mouse pointer over the selected telephone number and clicks to dial;

(g)   Hears telephone rings, busy signals, tri-tones, or answering machines;

(h)   Clicks a 'hang-up' button or hangs up the desktop telephone to end the call;

(i)   Manually dispositions the call results within the Salesforce record;

(j)   Decides to either leave the record open for a later attempt at another telephone number or closes the record, if appropriate; and

(k)   Clicks on a new Salesforce record among the open browser tabs and begins the process of dialing again.

(SOF, ¶ 24).  There are no other options or advanced dialer features available.  (SOF, ¶ 25).  There is no dialer software or hardware in operation or on the premises or previously or currently in use. (SOF, ¶ 26).  There is no capacity for ATDS functionality.  (SOF, ¶ 27).

Equally important to what the ShoreTel 14.2 and Salesforce systems do is what they do not have the capacity to do.  They do not have (and have never had) the capacity to:

       (a)      Store or produce numbers using a random or sequential number generator and dial those numbers;

       (b)      Dial any telephone number without direct and significant human intervention for each and every number dialed;

       (c)      Dial any telephone number automatically;

       (d)      Continue to automatically dial telephone numbers until a list is exhausted;

       (e)      Automatically dial telephone numbers based upon a prediction of agent availability;

       (f)      Abandon any telephone call;

       (g)      Automatically detect live connects or answering machines;

       (h)      Automatically dial numbers in rapid succession;

       (i)      Automatically disposition telephone calls; or

       (j)      Employ any advanced dialer features whatsoever.

(SOF, ¶ 28).  Importantly, the funding executive is not connected to a live call that was automatically dialed.  (SOF, ¶ 29).  Instead, the employee is required to review the potential seller's record and then exercise autonomy to manually initiate the calls that he or she deems appropriate, in the order that he or she deems appropriate.  (SOF, ¶ 30).  Depending on the call center employee's seniority and position, a supervisor may give that person a list of individuals to call in a certain timeframe.  (SOF, ¶ 31).  But the individual is still responsible for determining what number to call when. (SOF, ¶ 31).  In short, the system at issue here is not an ATDS.

      Even Buja's proposed DNC expert, Robert Biggerstaff, acknowledged at his deposition that he did not think a click-to-dial system should be considered an ATDS.  (SOF, ¶ 32) ("Q. And why did you think that click-to-dial calling should not be subject to ATDS liability under the TCPA?  A. Because I saw, as a database and computer telephony guy, a small but albeit existing benefit to consumers in permitting click-to-dial. . . .").  In fact, Biggerstaff

admitted that he suggested to the FCC that a click-to-dial system should not be considered an ATDS. (SOF, ¶ 33).

Moreover, Buja himself has admitted that he also does not consider this sort of system to be an ATDS. (SOF, ¶ 34) ("Q. If the Bank found your cell phone number in its database and pulled it up on a screen and clicked one button on the screen to call you to notify you of being overdrawn on your checking account, would you consider that a robocall? A. No."). Buja also acknowledged the following facts about the calls at issue, suggesting they were not ATDS calls:

- The voicemail messages left for him were made by "an actual human being" speaking in real time. (SOF, ¶ 35).

- When he did answer the calls, he was speaking to a "human being." *Id*.

- He could not discern any sign of the use of a predictive dialer. *Id*.

- The calls to him could have been made manually. *Id*.

- Sometimes there were people in the background making noise. *Id*.

In the face of this Everest of evidence demonstrating that the system at issue is not an ATDS, Buja's only factual allegation supporting the use of an ATDS is an online job posting from Funding's Web site that referenced a desire for applicants with experience using a "predictive dialer." (SAC, ¶ 19). The mere fact that the job posting sought applicants with predictive dialer experience does not mean that the system owned by Ventures *is* a predictive dialer. *See Chyba v. Bayview Loan Servicing, LLC,* 2016 U.S. Dist. LEXIS 133849, *10 (S.D. Cal. Sept. 27, 2016) (finding that a job posting that referenced a specific calling system "does not demonstrate that the named telephone equipment is an automatic telephone dialing system, and it is not evidence that the people who called Plaintiff used an autodialer"). But even if that job posting could be interpreted as evidence that a predictive dialer was actually being used, it was inartfully written at worst. Novation Settlement Solutions Vice President of Technology and

Facilities Jonathan O'Neill has testified (unrebutted) that, regardless of what the job posting says, Ventures has never used a predictive dialer to make calls on behalf of Funding. (SOF, ¶ 36). This was confirmed by Sponsler, the third-party expert who analyzed the system. Sponsler found that "a predictive dialer was not used because no automated dialing functions whatsoever are available." (SOF, ¶ 37). Simply put, the **only** means funding executives (or "callers," "call center employees," or "agents") have to contact sellers is by manually dialing each and every telephone number either by entering the number through the telephone keypad or clicking a hyperlinked telephone number in the Salesforce record. (SOF, ¶ 38).

Moreover, the call recordings include ambient noise, the sound of other people talking, and the sound of the funding executive talking while the telephone is ringing. (SOF, ¶ 39) (caller can be heard saying "[d]o you know who took my chair?" while the telephone is ringing). This indicates that each call is being manually dialed. If the system were a predictive dialer or some other form of ATDS, the caller would not come on the line until the call had been dialed and picked up by the called party. (SOF, ¶ 40). But here, the caller is on the line from the initiation of the call and is clearly handling only one call at a time. (SOF, ¶ 41). For the foregoing reasons, the Court should find that the system used to place the calls at issue in this case is not an ATDS and enter summary judgment in favor of Defendants on Count I.

**B.**     **The past use of the Refractive Dialer system version does not change this analysis.**

Buja will no doubt try to manufacture a fact issue by arguing that Ventures utilized a different type of system — known as a Refractive Dialer — in the past. But Magistrate Judge Matthewman (in a ruling upheld by the Court) has already found that "[a]s far as the [R]efractive [D]ialer issue, I don't find that to be relevant or probative." [DE 136, p. 2]. Ventures tested a Refractive Dialer system version for two days in 2011 and seven days in 2013 — it was never

implemented into the standard calling protocol. (SOF, ¶ 42). In October 2011, Ventures considered using the Refractive Dialer system version and O'Neill made five test calls over a two-day span. (SOF, ¶ 43). In 2013, Ventures again considered the Refractive Dialer system version. (SOF, ¶ 44). The plug-in to Salesforce was installed during the last week in January 2013, and between January 29, 2013, and February, 4, 2013, 704 calls were made using the system. (SOF, ¶ 45). Ultimately, Ventures determined that the Refractive Dialer system version did not meet its needs. (SOF, ¶ 46). No further calls were made using that system after February 4, 2013, and the software was uninstalled on or around February 27, 2013. (SOF, ¶¶ 47-48). It has not been present on Ventures' system since that time. (SOF, ¶ 49).

Under the version of the system tested by Ventures, it was still necessary for the funding executives to review a record and click to dial each phone number — there was always a live agent on the line, just as there is now. (SOF, ¶ 50). The purpose of the Refractive Dialer system version was simply to streamline this process by having the next Salesforce record appear on the funding executive's computer screen after the last record was dispositioned, rather than requiring the funding executive to go back to Salesforce and open each new record. (SOF, ¶ 51). Moreover, the Refractive Dialer system version has no relevance to the allegations in this case that Buja was called using an ATDS because the system version was uninstalled more than a year before Buja received any calls and no other Refractive Dialer system has ever been used. (SOF, ¶ 48) Thus, the Refractive Dialer issue (non-issue) should not alter the Court's analysis.

## C.    Even if the Ventures' system had the capacity to randomly or sequentially dial numbers (which it never did), mere capacity is not enough.

Finally, Buja may try to violently stretch the bounds of the TCPA to argue that the system should be considered an ATDS because it has the theoretical capacity to be turned into a system that could randomly or sequentially dial numbers. Any such argument should be rejected

because Buja has not produced any evidence to support that assertion — it would be purely speculative and inconsistent with the undisputed expert testimony of Ken Sponsler.

But even if the Court were willing to entertain this argument, various courts, including some in this Circuit, have rejected a broad reading of the capacity standard, finding that what really matters is how the actual system that called the plaintiff works.  *See, e.g., Chyba,* 2016 U.S. Dist. LEXIS 133849 at *10 (finding the plaintiff's "evidence" of ATDS use — including job postings and other public statements that seemed to describe what the equipment was capable of — too speculative and too disconnected to the specific calls at issue); *Pozo,* 2016 U.S. Dist. LEXIS 146432 at *5 ("[T]he fact that [defendant] might be able to undertake such a pointless endeavor [by completely reprogramming a system] does not mean that [the system] has the 'capacity' to be an autodialer or that it has the 'potential functionality' to be an autodialer within the meaning of the TCPA and the 2015 Order."); *Smith v. Stellar Recovery, Inc.,* 2017 U.S. Dist. LEXIS 35658, *17 (E.D. Mich. Feb. 7, 2017) (finding that a system was not an ATDS when it would require substantial modification to dial calls without human intervention).  The Court should apply the same standard here and find that any speculative argument about the capacity of the system at issue is not enough to defeat this motion.[1]

## IV.   Defendants are entitled to summary judgment on Buja's DNC claim.

Buja's claim in Count II of the SAC is that Defendants made calls to him after he asked to be placed on their internal DNC list, and that they failed to have adequate DNC policies and procedures in place.  (SAC, ¶¶ 60-62).  The calls at issue were made by funding executives

---

[1] If the Court concludes that the mere theoretical capacity of equipment to randomly or sequentially dial numbers is sufficient to make that equipment an ATDS, then the Court should stay this proceeding pending resolution of *ACA Int'l v. FCC,* Case No. 15-1211, U.S. Court of Appeals for the D.C. Circuit.  That appeal, which is fully briefed and argued, will address the appropriate scope of the FCC's capacity order.

-10-

employed by Ventures to make calls on behalf of Funding.  (SOF, ¶ 3).  But there has been no DNC violation here because the DNC provisions of the TCPA do not apply to Ventures and Funding because they are not telemarketers, and even if the DNC provisions did apply, Ventures and Funding have complied with the DNC requirements (not because they have to but because they choose to in an effort to call only those sellers and potential sellers who wish to be called).

> **A.** **Defendants cannot be liable under the DNC provision of the TCPA because they are not "telemarketers" or "sellers."**

The DNC provisions of the TCPA apply to "telemarketers" and "sellers."  *See* 47 CFR 64.1200.  The operative complaint describes the activities at issue as follows: "Defendants are in the business of ***purchasing*** structured settlements and annuities for a lump sum of cash."  (SAC, ¶ 8) (emphasis added).  Buja does not allege that the individuals calling on behalf of Funding attempted to sell him anything, and the call recordings demonstrate that the funding executives who called him were actually offering to ***give*** gifts to Buja in return for allowing them to provide a free quote on the value of his structured settlement.  (SOF, ¶ 6).  Nothing in the factual record shows that Ventures' employees, calling on behalf of Funding, attempted to sell anything to him.

Thus, Ventures and Funding are not "telemarketers" or "sellers" as defined by the TCPA and the applicable regulations.  Subsection (c) of the TCPA instructs the commission to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights ***to avoid receiving telephone solicitations*** to which they object." *Id*. at (c)(1) (emphasis added).  Under this authority, the Commission enacted Section 64.1200 to govern telemarketers and sellers.  Under 47 C.F.R. § 64.1200(f)(11), the term "telemarketer" means "the person or entity that initiates a telephone call or message for the purpose of encouraging ***the purchase or rental of, or investment in***, property, goods, or services, which is transmitted to any person."  (Emphasis added).  The term "telemarketing" means "the initiation

of a telephone call or message for the purpose of encouraging *the purchase or rental of, or investment in*, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12) (emphasis added).  The term "telephone solicitation" means "the initiation of a telephone call or message for the purpose of encouraging *the purchase or rental of, or investment in*, property, goods, or services."  *Id.* at (14) (emphasis added).  And the term "seller" means "the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging *the purchase or rental of, or investment in*, property, goods, or services, which is transmitted to any person."  *Id.* at (9) (emphasis added).

Based on the language of the statute and the regulations, the TCPA was clearly intended to address entities "encouraging the purchase or rental of, or investment in, property goods, or services."  Ventures and Funding do not do *any* of those things, thus these regulations do not apply to them.  Given the nature of their operations, it cannot reasonably be argued that Ventures or Funding is attempting to encourage purchases, rentals, or investments.  Funding is a *purchaser* of structured settlements, not a *seller* of any goods or services — there was no scenario in which Ventures or Funding would have sold anything to Buja.

This interpretation of the statutory and regulatory framework for the DNC is consistent with the case law interpreting the meaning of the term "telemarketing" under the TCPA.  In *Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1234 (10th Cir. 2004), the court held that the TCPA's DNC restrictions "apply only to telemarketing calls made by or on behalf of sellers of goods or services."  The court specifically defined "telemarketing" as "commercial sales calls made to *induce purchases* of goods or services."  *Id.* at n. 6 (emphasis added).  Similarly, in *Dolemba v. Ill. Farmers Ins. Co.*, 2015 U.S. Dist. LEXIS 104314, *13 (N.D. Ill. Aug. 10, 2015), the court analyzed whether a prerecorded call that "invited [plaintiff] to participate in a 'town

hall call' during which he would learn about becoming a[n] insurance agent" did not constitute "telemarketing" under the TCPA because "the call did not explicitly *or implicitly* encourage him to purchase" anything.  (Emphasis in original).  In other words, making a phone call to a called party for commercial purposes is not sufficient to state a claim. The purpose of the call must be to induce the called party to ***buy*** a good or service.  Recruiting or soliciting a called party to ***sell*** a thing or service is simply not covered by the plain language of the TCPA and applicable regulations.  *See also Makaron v. GE Sec. Mfg.,* 2015 U.S. Dist. LEXIS 75240, *12 (C.D. Cal. May 18, 2015) ("At a minimum, a 'seller' must be engaged in the business of selling or renting some sort of property, good or service.").  Here, the alleged calls were not directly or implicitly inducing purchases or attempting to sell any sort of property, good, or service.

Moreover, applying the DNC provisions of the TCPA to Ventures' non-telemarketing activities would be barred by the Due Process Clause of the United States Constitution because the statute would fail to give adequate notice.  A statute is impermissibly vague, and violates the Due Process Clause, if it fails to provide fair notice to reasonable persons of what conduct is prohibited:  "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The void for vagueness doctrine has been applied in the context of civil statutes.  *See United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129 (7th Cir. 1984); *Horvath v. Chicago*, 510 F.2d 594, 596 (7th Cir. 1975).  Here, because a reasonable person reviewing the TCPA would not conclude that the DNC provisions were intended to cover calls related to the purchase of structured settlements, the statute should not be interpreted in such a way as to cover those activities.

-13-

In its March 31, 2017 Order, the Court granted Buja leave to amend his complaint to add the DNC claim despite Defendants' argument that Ventures and Funding are not "sellers" or "telemarketers." [DE 101, at p. 13]. The Court held that "Defendants' argument ignores the many services they provide as part of the structured-settlement transfer transaction." *Id.* The Court emphasized that Ventures and Funding "may perform a number of services to effectuate the transaction (for a fee charged to the payee)." *Id.* While the Court is correct that services must be performed to effectuate the purchases, Ventures and Funding do ***not*** charge a fee to the seller for those services. (SOF, ¶ 7). Thus, Ventures and Funding are not promoting "the purchase or rental of, or investment in" those services. Accordingly, the Court should enter summary judgment in favor of Defendants on Count II.

### B. Ventures and Funding have adequate DNC policies and procedures in place, further justifying summary judgment in favor of Defendants.

Even if it were possible to conclude that the calls at issue were intended to induce purchases or sales (which they weren't), Ventures and Funding are entitled to summary judgment on Count II because Ventures (in placing calls on behalf of Funding) complied with the statutory and regulatory requirements for DNC compliance (not because it was required to do so but because it wanted to do so as a matter of efficient and sound business practice in trying to reach sellers and potential sellers who wanted to be called).[2]  The federal regulations at 47 C.F.R. 64.1200(d) set forth six clear requirements for compliance with the DNC provision of the TCPA:

---

[2] As defense counsel has repeatedly emphasized to Plaintiff's counsel, it would be counterproductive for Ventures to "blast call" people indiscriminately and not observe internal DNC requests.  The business of structured settlement purchase is sophisticated and highly targeted to those people who might be or are interested in selling their structured settlements because of their need for a large amount of cash now as opposed to smaller amounts of cash over time.  The business model is structured to yield no calls if there is no interest.  That's why Mr. Buja was "DNC'd" within 30 days of his desire becoming clear.

(1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request.  If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

Ventures' compliance with each of these requirements has been proven in this litigation.

Ventures has produced written DNC policies.  (SOF, ¶ 52).  Ventures has produced its training

materials on the existence and use of the internal DNC list.  (SOF, ¶ 53).  Ventures funding

executives are trained to provide the called party with the name of the individual caller, the name of the entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.  (SOF, ¶ 55).  And Ventures maintains a DNC list (as part of its Do Not Market list), which Ventures produced in this litigation.  (SOF, ¶ 54)

Thus, the only conceivable element of DNC compliance that Buja could challenge is whether Ventures properly records all DNC requests within a reasonable period of time.  The record shows that Buja's DNC request was honored within a reasonable period of time.  The Court has already determined that Buja did not make a DNC request before July 1, 2015.  [*See* DE 101, p. 10].  Assuming for the sake of this Motion only that Buja made a DNC request on July 1, 2015,[3] the Court can determine as a matter of law that Buja's request was honored within a reasonable period of time.  The next call placed to Buja's phone number was on July 14, 2015. (SOF, ¶ 54).  That call went to voicemail, meaning there was no opportunity for the funding executive to speak to Buja and clarify any confusion from the July 1, 2015 call.  *Id.*  Notably, that call (standing alone) would not be a violation of the TCPA's DNC provision because an individual must receive two or more calls to have a private cause of action.  *See* 47 U.S.C. § 227(c)(5).  The ***only*** potentially actionable call to Buja's phone number occurred on July 23, 2015.  (SOF, ¶ 59).  During that call, Buja asked to be placed on the DNC list and Buja never received another call on behalf of Funding after July 23, 2015.  (SOF, ¶ 59).  Thus, Buja's DNC request was honored either 22 days or immediately after his request (depending on which call is deemed the effective request), well within the 30-day period that the FCC has established as the

---

[3] Defendants contest that Buja made a definitive DNC request on July 1, 2015.  Listening to the recording of that call, it is clear that the funding executive who placed the call is confused by Buja's apparent frustration and references to multiple companies.  *See* Recordings filed previously with the Court [DE 49].  The funding executive may have thought there was confusion about what company he was with.  A jury could reasonably conclude that the funding executive was confused and therefore did not understand Buja to have made a DNC request.

outside boundary for reasonableness, and immediately after the July 23, 2015 request.

As the plaintiff, Buja bears the burden of proving that this was an unreasonable delay in recording the DNC request, and he has not done so.[4]   The Biggerstaff Report defined "actionable" calls under the DNC as calls made "14 or more days after the date of the DNC request."  (SOF, ¶ 61).  But this is an arbitrary cutoff that Biggerstaff did not explain in his report.  In his deposition, Biggerstaff admitted he used the 14-day cutoff simply because Buja's counsel told him to do so.  (SOF, ¶ 72).  Biggerstaff's arbitrary choice of 14 days is particularly suspect because an analysis of his data shows that he *actually* applied a 13-day grace period. (SOF, ¶ 62).  That decision certainly was no accident — a 14-day period would have excluded the July 14, 2015 call to Buja, whereas the 13-day period included it.

There is no statutory or regulatory authority that supports Buja's approach — the *only* FCC guidance on determining whether a DNC request is processed in a reasonable amount of time is the 30-day period set forth in 47 C.F.R. § 64.1200(d).  Moreover, the Federal Trade Commission states that unwanted calls will stop *within 31 days* once a telephone number has been added to the National Do Not Call Registry.  *See* FTC's Consumer Information page at https://www.consumer.ftc.gov/articles/0108-national-do-not-call-registry, last visited January 31, 2018.  Accordingly, the Court should find that Ventures processed Buja's DNC call request in a reasonable period of time and enter summary judgment in favor of Defendants.[5]

---

[4] It is notable that Buja actually filed suit on July 21, 2015, two days before the last call. Thus, at the time Buja filed his lawsuit, he had no viable DNC claim.

[5] Even if the single call to Buja on July 23, 2015, could be considered a DNC violation, the detailed analysis needed to reach this conclusion demonstrates why this case cannot be certified as a class action.  For each and every member of the putative class, it would be necessary to analyze whether a DNC request was actually made and then determine, in light of the circumstances, whether the request was proceed in a reasonable period of time.

**C.**     **The Biggerstaff Report, concluding that Defendants do not have adequate DNC procedures in place, is deeply flawed and should be disregarded.**

In arguing that Ventures and Funding have failed to comply with the DNC provisions of the TCPA, Buja may attempt to rely on the conclusions of his so-called DNC expert Robert Biggerstaff.  But Biggerstaff's conclusions are flawed in numerous respects and should be entirely disregarded.[6]  A detailed description of the myriad problems with Biggerstaff's report is set forth in the rebuttal report of Defendants' expert Jan Kostyun.  (*See* SOF, Exh. L).  Additionally, if Plaintiff relies in any way on Biggerstaff's report in seeking class certification, Defendants will move to strike the report and Mr. Biggerstaff as a supposed "expert."

Biggerstaff opines that "the majority of the stop and do not call requests (based on the text of the comments) were not documented in the DNC list."  (SOF, ¶ 63).  But his report presents absolutely no data to support this incredibly vague conclusion.  Moreover, to the extent there is any numerical support, it is based on flawed assumptions and incomplete information:

- Biggerstaff's analysis failed to address the fact that the Salesforce records he reviewed were not "call records," but rather activity histories from a CRM database.  (SOF, ¶ 64).

-  Biggerstaff's methodology for identifying DNC requests within the Salesforce records was flawed, repeatedly capturing records that were not actually DNC requests.  (SOF, ¶ 65).  Although Biggerstaff acknowledged in his deposition that the best way to determine the content of a call would be to listen to a call recording, he did not listen to or request any call recordings other than the recordings of the calls with Buja.  (SOF, ¶ 73).

---

[6] In addition to analyzing DNC compliance issues, the Biggerstaff Report purports to identify a class of individuals whose DNC requests were not honored in a timely fashion.  This analysis is equally flawed, and Defendants will address those flaws in responding to Buja's motion for class certification.

- Biggerstaff's analysis failed to address the fact that "DNC list" he used was actually a "do-not-market list" that included more than simply DNC requests.  (SOF, ¶ 66).

- Biggerstaff's methodology for determining whether calls were made relied on "Subject" headings that did not necessarily indicate that a call was made.  (SOF, ¶ 67).

- Biggerstaff's analysis failed to account for the fact that each account record in Salesforce contains multiple telephone numbers.  (SOF, ¶ 68).

- Biggerstaff's analysis did not control for individuals who initiate contact and consent with Ventures after they have previously asked not to be called.  (SOF, ¶ 69).

Biggerstaff claimed at his deposition that all he was retained to do was conduct an empirical analysis of the data that was provided to him.  (SOF, ¶ 74).  But his failure to account for the factors listed above renders his "empirical analysis" meaningless.  In fact, Biggerstaff admitted that he used non-empirical analysis to check his results for accuracy, recognized that there were errors, but did nothing to correct them.  When questioned at his deposition about the accuracy of his identification of "Stop" requests, Mr. Biggerstaff responded that he had analyzed a random sampling of approximately 200 of his results and found what he described as two that were "questionable," referring to them as "false positives." (SOF, ¶ 75).  In this exchange, when Mr. Biggerstaff uses the term "false positive," it is a euphemism for "error."  Mr. Biggerstaff clearly knew that his results contained errors (or at least "questionable" results) but did not identify any of those errors in his report, and did not describe any attempts at correcting those errors.

Biggerstaff also opined that "[t]his is a strong indicator that the operators of this system do not have sufficient policies or procedures in place to honor do-not-call requests."  (SOF, ¶ 70).  This is pure speculation.  As an initial matter, this assertion is based entirely on his conclusion that the majority of DNC requests are not honored.  Because Biggerstaff's conclusion

that the majority of DNC requests are not honored is faulty, his assertion that there are not adequate policies and procedures in place is similarly defective.   Further, the term "strong indicator" is inherently vague and meaningless in conducting a scientific analysis.    In fact, Biggerstaff admitted in his deposition that he could not "put a percentage on" his belief that there were not adequate procedures in place.  (SOF, ¶ 76).  Despite his assertion that Ventures "does not have sufficient policies or procedures in place to honor do-not-call requests," Biggerstaff stated in his deposition that "I wasn't asked to render an opinion on the legal sufficiency or meeting the legal standard in the CFR and I have not requested any of the documents to that extent or for that point."  (SOF, ¶ 77).  Biggerstaff did not review any of Ventures' policies, training materials, or call scripts to assess the adequacy of their policies and procedures, nor has he reviewed the Rule 30(b)(6) depositions in this case or sought any additional information from Ventures.  (SOF, ¶ 78).  In his rebuttal report, Kostyun opined that it is impossible to assess a company's DNC policies without reviewing policies and procedures and other information related the company's systems.  (SOF, ¶ 79).  Because Biggerstaff has not undertaken any review of Ventures' policies and procedures, his conclusions about DNC compliance are based entirely on his flawed and inaccurate data analysis and should be disregarded.

## V.     Defendants are entitled to summary judgment on Count III because Buja has no viable TCPA claim.

Count III requests injunctive relief under the TCPA.  For the reasons set forth above, Buja has no viable claim against Ventures or Funding and thus, the Court should enter summary judgment in favor of Defendants on Count III as well.

## VI.    Conclusion

For the foregoing reasons, the Court should grant summary judgment in favor of all three Defendants on all claims asserted by Buja.

Dated: February 16, 2018

THOMAS & LOCICERO PL

/s/ *Dana J. McElroy*
Dana J. McElroy
Florida Bar No.0845906
915 Middle River Drive, Suite 309
Ft. Lauderdale, FL  33304
Telephone: (954) 703-3416
Facsimile:  (954) 400-5415
Email:  dmcelroy@tlolawfirm.com

VEDDER PRICE, P.C.
Blaine C. Kimrey (*Pro Hac Vice*)
Bryan K. Clark (*Pro Hac Vice*)
222 N. LaSalle Street
Chicago, IL 60601
Telephone:  (312) 609-7500
Facsimile:  (312) 609-5005
Email:  bkimrey@vedderprice.com
Email:  bclark@vedderprice.com

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **16th** day of **February 2018**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

By: */s/ Dana J. McElroy*
Attorney

## **SERVICE LIST**
(*Kevin Buja v. Novation Capital, LLC., et al.*)

SCOTT D. OWENS, ESQ.
*Attorney for Plaintiff*
3800 S. Ocean Dr., Ste. 235
Hollywood, FL 33019
Tel: 954-589-0588
Fax: 954-337-0666
scott@scottdowens.com

KEITH J. KEOGH, ESQ.
*Attorney for Plaintiff*
Keogh Law, LTD
55 W. Monroe Street
Suite 3390
Chicago, IL 60603
Tel: 312-726-1092
keith@keoghlaw.com